BRERETON *v.* ESTATE OF GLAZEBY.

1. WILLS — MENTAL COMPETENCY — PRESUMPTIONS — BURDEN OF PROOF.

In proceedings for the probate of a will, mental competency of maker is presumed as in other cases, and burden of proof is upon contestant to show lack of such competency (3 Comp. Laws 1915, § 12546).

2. SAME—RIGHT OF TESTATOR TO CHOOSE OBJECTS OF BOUNTY.

Testator has right to choose objects of his bounty, and jury may not review equity of his determination.

3. SAME—MENTAL CAPACITY.

That provisions of will are fair under the circumstances may be helpful in considering whether there was mental capacity to make will.

4. SAME—BURDEN OF PROOF.

In proceedings to contest will on ground of testatrix's lack of mental capacity, contestants *held,* not to have sustained burden of proof demanded by statute (3 Comp. Laws 1915, § 12546).

Error to Wayne; Murphy (Alfred J.), J. Submitted April 10, 1930. (Docket No. 70, Calendar No. 34,800.) Decided June 27, 1930.

Oliver J. Robinson presented for probate the last will of Mary J. Glazeby, deceased. From an order admitting the will to probate, William H. Brereton and others appealed to the circuit court. Judgment for contestants. Proponents bring error. Reversed and new trial ordered.

*James G. Tucker,* for appellants.

On presumption and burden of proof as to mental capacity of testator, see annotation in 36 L. R. A. 724, 733.

As to what constitutes capacity or incapacity to make will, see annotation in 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

*Anderson, Wilcox, Lacy & Lawson* (*C. J. Huddleston,* of counsel), for appellees.

BUTZEL, J.   Mary J. Glazeby died on the 14th day of September, 1927, in her 86th year, leaving a last will which was executed on January 13, 1927. After making provisions for her burial and funeral services, she left all of her property, amounting to $12,189 to a nephew, Oliver J. Robinson, and his wife, Nathalie Robinson. In 1920 testatrix made a previous will, and shortly thereafter a codicil, leaving the larger part of her household furniture and $1,000 to Robinson, bequests of $2,000 to Frederick Flower, $1,000 to his wife, $1,000 to her niece, Emma Bagnall, and the residue of the estate to William D. Brereton, testatrix's son. Brereton died in 1923, leaving a son, William H. Brereton, of Denver, Colorado. He, together with Frederick Flower, Caroline Flower, and Emma Bagnall, are contesting the will of January 13, 1927, on the ground that testatrix did not have mental capacity to make a will. Flower was an old friend of testatrix and had charge of her affairs for many years. He was not related to her. Brereton, the grandson, while a party to the contest, did not appear as a witness, and his activities in the contest were carried on by Flower, who held his power of attorney and signed his name to the necessary pleadings in the case. The will was admitted to probate by the probate court for the county of Wayne. On appeal to the circuit court the jury found against the will.

There are two assignments of error. One relates to the charge of the circuit judge, which was full and complete, notwithstanding the fact that he did not adopt the exact words set forth in proponents' specific requests to charge. There was no request

made by proponents for a directed verdict or for a judgment *non obstante veredicto.* The second assignment of error is that the court did not grant a motion for a new trial on the ground that the verdict was against the great weight of the evidence. The will was contested on the sole ground that testatrix was mentally incompetent to make a will on January 13, 1927. Under the circumstances, it is necessary to review the testimony rather fully.

In proceedings for the probate of a will, mental competency is presumed as in other cases, and the burden of proof is upon the contestant to show lack of such competency. Section 12546, 3 Comp. Laws 1915; *In re Rosa's Estate,* 210 Mich. 628, 633; *In re Murray's Estate,* 219 Mich. 70; *In re Mann's Estate,* 219 Mich. 695; *In re Curtis' Estate,* 197 Mich. 473; *In re Gardiner's Estate,* 198 Mich. 203; *In re Ferguson's Estate,* 239 Mich. 616; *In re Barlum's Estate,* 240 Mich. 393. Has this burden been sustained in the present case?

It seems to be conceded by all parties that the testatrix up to her 80th year, notwithstanding some physical ailments, was strong and able-bodied; that her mind was alert and she was unusually intelligent for a woman of her years. Her husband died in 1920, and it is claimed that she began to show the signs of her age from that time. She suffered from some valvular condition, but it is also conceded that her physical and mental condition remained very good until 1923, when her son died. After that she was still able to continue to take summer trips, up to and including the year 1926, when she went to Denver to see her grandson. After the death of her husband in 1920, testatrix made her home with the Robinsons, to whom she deeded the home on Fourteenth avenue, Detroit, Michigan, subject to a

life lease which she retained in herself; they also gave her $3,000 mortgage, which is part of the estate. It is also generally conceded that the Robinsons were very good and kind to her from the time she went to live with them up to the time of her death. She was happy in their home and seemed to enjoy the comfort and care that she needed. On the 15th day of December, 1926, she suffered a stroke of paralysis, as a result of which her right leg, right arm, and the side of her face were affected. Immediately after the stroke both her mental and, physical condition were bad, but after two weeks her mind cleared, and on the 13th day of January, 1927, her mental faculties seemed to have been restored, notwithstanding the fact that her hearing and eyesight remained poor and her speech somewhat indistinct. There is some question as to whether she was suffering from advancing cataracts of the eyes; though this is disputed, there seems no doubt that she had difficulty in reading without the aid of a magnifying glass for some time previous to her death. The will in question was drawn by an attorney who had his offices in the neighborhood. According to the undisputed testimony of Robinson, on the 13th day of January, 1927, testatrix asked for the services of an attorney, whereupon Robinson went to the neighborhood branch of a large bank and asked the manager to recommend an attorney. He directed Robinson to one who had offices over the bank. The attorney went to testatrix's home, drew the will, and was paid by testatrix according to his testimony. She signed the will by making her mark in the place for the signature. The will was witnessed by a neighbor and by Dr. Robert M. Martin, who had attended testatrix for many years and remained her physician up to the time of her death.

He states unequivocally that testatrix was keen and alert mentally, and that after two weeks from the time of the stroke she had regained her mental faculties, and that she knew what she wanted done. At various times during her last sickness, and particularly during the two weeks following the stroke, testatrix was given an opiate, but Dr. Martin states that at the time the will was made her mental condition was sound and that she was able to attend to business. We shall briefly review the testimony of the witnesses for the contestants.

Mr. Flower, who with his wife would have received $3,000, practically one-fourth of the estate, under the first will and codicil were the present will disallowed, testified that testatrix's mind was such and her powers of speech, hearing, and eyesight were so impaired that she could not have been able to make a will. He testified that he took care of decedent's affairs; that just prior to the stroke on December 15, 1926, decedent made out checks, as she usually did, for Christmas presents. Notwithstanding his claim that decedent was mentally incompetent, Flower stated that he took checks aggregating several hundred dollars and placed them under testatrix's pillow while she was asleep, the day before Christmas. This was almost three weeks before the will was executed. Just why Flower should put these checks under the pillow of one whom he claims was an imbecile seems hard to understand. It developed upon cross-examination that Flower kept two checks of $200 running respectively to himself and wife, which had been previously signed by testatrix, and which he did not put under her pillow. Moreover, during the following summer, while Flower was away on a trip, at a period when he claims that testatrix had no sight, hearing, or men-

tal capacity, he sent a postal card addressed to testatrix.

Contestants also produced the cashier and assistant cashier of the bank in which testatrix kept her funds, and who went to her home shortly after January 13, 1927, and several times thereafter, for the purpose of having her sign checks. She signed these checks in the presence of the bank officers by making her mark upon them. They testified that they could not understand her, and did not know whether she understood them; that they could not testify whether she was mentally competent, or not; they did not know. They permitted her to sign the checks by making her mark.

Emma Bagnall, a niece, who was omitted from the will, but remembered in the first will, testified that she visited testatrix once some five months after the stroke, and that testatrix failed to recognize her, notwithstanding that they had been always very good friends; that she did not know what testatrix's mental condition was; that testatrix had cataracts before the stroke and was unable to see.

Minnie Bagnall, another niece, testified that she visited testatrix immediately after the stroke and in the months of March and August following; that testatrix failed to recognize her, though witness thought that testatrix asked a question about witness' mother.

Ida Bagnall, another niece, testified that testatrix had cataracts a year before the stroke; that she was unable to read except large type with the aid of a magnifying glass.

Herbert Bagnall testified that he saw testatrix some time on or about the date that the will was executed; that she failed to recognize him, although Mrs. Robinson attempted to tell her who was in the

room; and that her mind was a complete blank at the time.

Mrs. McIsaac, a friend of the Bagnalls, testified that she visited testatrix the Monday after Christmas, in 1926, but that testatrix could only mumble sounds and could not enunciate words; she also saw her in March, 1927, and testified that testatrix could not speak at that time, but would attempt to mumble something and then begin to cry. Witness also testified that deceased had impaired eyesight prior to the stroke.

The attorney who drew the will in 1920 saw testatrix in 1926. He testified that she was not then as bright or keen as she had been in 1920; that her speech had become indistinct; and that she used a large magnifying glass to see with.

A neighbor also testified that he saw testatrix in June, 1927, and that she could only mumble.

This constituted all of the testimony offered by contestants, except that Robinson, as an adverse witness, swore positively that testatrix's mental condition was absolutely good both at the time when the last will was drawn and thereafter. Not a single witness testified to anything irrational that decedent ever did or said. None of them, with the exception of Flower and Herbert Bagnall, testified as to her condition in January at the time the will was executed.

Contrasted with contestants' testimony is that of 21 witnesses who positively stated that decedent was in full possession of her mental faculties and was fully able to understand them and converse with them. In addition, the testimony of Dr. Martin and Mr. and Mrs. Robinson and the attorney who drew the will showed that testatrix's mental condition was such that she would legally have the capac-

ity to make a will. Sixteen of the witnesses of the proponents were wholly disinterested. It is true that they were neighbors and friends of both testatrix and the Robinsons. They were the very persons who would have knowledge of the condition of the testatrix. Included among these witnesses for proponents was Charles Bagnall, who had been omitted from both wills and who was a brother of several of the contestants. He had absolutely no interest in the outcome of the case. He testified he saw decedent a week after the stroke; that her mental condition was as good as ever; that he carried on a conversation with her.

A testator has the right to choose the objects of his bounty and no jury may review the equity of his determination. *In re Allen's Estate,* 230 Mich. 584. However, the fact that the provisions of a will are fair under the circumstances may be helpful in considering whether there was mental capacity to make the will. The estate was a comparatively small one. The will of 1920 was drawn at the home of Flower by an attorney selected by him. In it Flower's wife was left $2,000, and Robinson received only the household furniture. It was but a short time thereafter that a codicil was drawn, leaving Robinson $1,000 and reducing Mrs. Flower's legacy by that amount. The affection testatrix bore to the Robinson family is further demonstrated by the fact that she deeded the home to them, subject to a life lease in herself and the $3,000 mortgage, and that she made her home with them. Testatrix was practically alone in the world; all of her lineal descendants predeceased her, with the exception of a grandson, who lived in a far distant city. The Robinsons were nearer to her than anyone else. There is no certainty from the testimony of any of

the contestants' witnesses that any of them saw testatrix at the time the will was drawn, though possibly some of them may have visited her about that time. She was an old lady and might have been suffering from her physical ailments, or had her suffering alleviated by an opiate at the very time of such visit. The testimony, however, of a very large number of witnesses who saw her shortly before, at or about the time, and shortly after the will was drawn establishes the fact that her mind was clear, and although her speech may have been difficult she could make herself understood at the time the will was executed. It seems to us that the contestants have not sustained the burden of proof that the statute demands in showing that testatrix had not the mental capacity to make a will, and that the verdict is against the great weight of the testimony.

Under the circumstances, inasmuch as a motion for a new trial was timely made and exceptions to the refusal to grant it duly filed, a new trial will be granted. *In re Ver Vaecke's Estate,* 214 Mich. 281; *In re Lukaszewski's Estate,* 223 Mich. 524.

The judgment of the lower court is reversed, with costs to appellants, and a new trial is ordered.

WIEST, C. J., and CLARK, McDONALD, POTTER, SHARPE, NORTH, and FEAD, JJ., concurred.